## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **JAMES BREIDECKER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 3:20-CV-253-MAB** |
| ) | |
| **GARNETT WOOD PRODUCTS CO.,** ) | |
| **INC.,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

Plaintiff James Breidecker worked for Defendant Garnett Wood Products ("GWP") for over 20 years as a sales representative. After his employment was terminated in 2018, he filed this lawsuit with the assistance of attorney Tom Ysursa and proceeded on claims against GWP for age discrimination and retaliation, disability discrimination and retaliation, and violations of Illinois' wage and hour laws (Doc. 1; Doc. 39).[1] The undersigned referred this case into the District Court's Mandatory Mediation Program (Doc. 52; *see also* Doc. 30), and the parties participated in a mediation session on June 15, 2022. They were able to reach a settlement on Plaintiff's claims, and the principal terms of their agreement were outlined in a Memorandum of Material Settlement Terms

---

[1] Plaintiff initially sued not only GWP but also Mark Garnett, the president and owner of GWP, and Bob Risby, a sales manager and Plaintiff's supervisor at GWP (Doc. 1). However, Plaintiff's claims against Garnett and Risby for negligent and intentional infliction of emotional distress were dismissed on a motion to dismiss under Rule 12(b)(6) (Doc. 39)

("Settlement Memorandum"), which both Plaintiff and GWP signed (Doc. 80-1). A comprehensive, written settlement agreement and release was to follow (*see id.*). The mediator notified the Court that the case had been settled in principal, but the parties needed additional time to finalize the settlement. For the next several weeks, Mr. Ysursa and defense counsel went back and forth, working through the ancillary details and the language of the written agreement. Once the attorneys had a draft they were satisfied with, they sought approval from their clients. But Plaintiff balked and refused to sign.

Plaintiff's refusal to sign the written settlement agreement led GWP to file a motion seeking to enforce the settlement and for sanctions in the form of attorneys' fees (Doc. 80), which is presently before the Court. Plaintiff filed a response in opposition to GWP's motion to enforce (Doc. 87; *see also* Docs. 88, 96). GWP did not file a reply brief.

Also before the Court is Plaintiff's "Motion for Backdating of Pacer Exemption and Waiver of Pro Rata Share Fee of Mediator Fee" (Doc. 95; *see also* Doc. 96). In this motion, Plaintiff asks the Court to waive his pro rata share of the mediator's fee, to backdate his PACER exemption "to include fourth quarter 2022," and to waive a transcript fee. GWP did not file a response.

## FINDINGS OF FACT

On the basis of the record before it, the Court finds the following facts regarding the settlement negotiations.

The undersigned referred this case into the District Court's Mandatory Mediation

Program, and the parties agreed to use Frank Neuner as the mediator (Doc. 52; Doc. 57).[2]
They participated in a mediation session at Mr. Neuner's office in Clayton, Missouri on
June 15, 2022. Plaintiff appeared at the mediation in-person along with his attorney, Tom
Ysursa. Defendants Mark Garnett and Bob Risby also participated in the mediation along
with their attorneys, Travis Kearbey, Ramona Eason-Palmer, and Camille Roe.[3]

The mediation lasted all day, beginning at approximately 9:30 a.m. and going until
approximately 5:30 p.m. (Doc. 80, p. 2; *see also* Doc. 87, pp. 2, 3). By the end, the parties
had reached an agreement to settle Plaintiff's claims. A Settlement Memorandum was
prepared, which stated that Plaintiff and GWP "agree[d] to finally and completely settle
all of Plaintiff's claims against [GWP] . . ." on nine material terms (Doc. 80-1). Those nine
material terms, stated in brief, were:

1. Defendant promised to pay Plaintiff a sum of money;
2. Each party agreed to pay one-half of the mediation fee;
3. Plaintiff promised to release all claims against Defendant and its
   affiliated entities and individuals, and to dismiss this lawsuit within 10
   business days of receiving the settlement funds;
4. Plaintiff agreed not to seek or accept re-employment with GWP;
5. Each party agreed not to disparage the other;
6. Plaintiff agreed to keep the terms of the settlement confidential;
7. Neither party admitted liability or wrongdoing;
8. "In the event of an action for breach of the settlement, the prevailing
   party in such action shall be entitled to recover its reasonable attorney's
   fees from the non-prevailing party;" and

---

[2] Plaintiff tries to imply that the defense unilaterally chose the mediator (Doc. 87, pp. 2–3), but that is simply
not true, as evidenced by the Stipulation signed by attorneys for both sides and filed with the Court, which
indicates the parties "stipulated and agreed" to Frank Neuner serving as the mediator (Doc. 57).

[3] Plaintiff indicates that Mr. Ysursa gave "the defense permission to 'not attend in person.'" (Doc. 87, p. 2).
It is unclear if "the defense" means Mr. Garnett, Mr. Risby, and/or their attorneys. It is also unclear how
"the defense" appeared at the mediation, *e.g.,* virtually via videoconferencing, by telephone, etc.

9. "Other standard terms and conditions for a release (such as, for instance, tax treatment provisions, etc.)"

(Doc. 80-1). The Settlement Memorandum further provided that the material terms of the settlement would be memorialized in a comprehensive, written settlement agreement and release in the days to come (*Id.*). Plaintiff and GWP each signed the Settlement Memorandum on June 15, 2022, at the conclusion of the mediation (Doc. 80-1).

In light of the parties' agreement, Mr. Neuner notified the Court that the case had settled but the parties needed additional time to consummate the settlement (Doc. 64). Consequently, the Court entered a 60-day Order, giving the parties 60 days to finalize the settlement before the Clerk of Court entered judgment (Doc. 65). In light of the settlement, all deadlines and hearings in the case were vacated and all settings were canceled (*Id.*).

As promised, defense counsel sent Mr. Ysursa a draft written settlement agreement two days after the mediation (Doc. 80-2; *see also* Doc. 80-1). Mr. Ysursa looked it over and proposed a variety of edits (Docs. 80-3, 80-4). After discussing the proposed edits with Mr. Ysursa, defense counsel modified the written settlement agreement accordingly and sent it to Ysursa on June 23, 2022 (Doc. 80-5). Mr. Ysursa reviewed the updated draft two weeks later and proposed two additional changes, which were agreed to by defense counsel and incorporated into the written settlement agreement (Doc. 80-8; *see also* Doc. 80-7). In response, Mr. Ysursa wrote on July 7, 2022, "I am good with the current draft. I will start the process of getting my client[']s approval." (Doc. 80-9).

After Mr. Ysursa reviewed the written settlement agreement with Plaintiff, he wrote to defense counsel that his client's "only remaining concern" pertained to the

issuance of a 1099-MISC in connection with the portion of the settlement payment intended to cover Plaintiff's non-economic damages (*see* Doc. 80-10, pp. 2, 4; *see also* Doc. 80-8, p. 3). Mr. Ysursa proposed some minor additional language and stated "[i]f you are fine with the tracked changes then we are good to sign and conclude this" (Doc. 80-8, pp. 1–2). Mr. Ysursa and defense counsel discussed the issue over the phone and were able to reach an agreement on additional revised language (*Id.* at p. 1). Defense counsel revised the written settlement agreement accordingly and sent it to Mr. Ysursa on July 26, 2022, for his client's signature (*Id.* at p. 1).

Over the next couple weeks, defense counsel checked in with Mr. Ysursa several times to ask whether Plaintiff had signed the written settlement agreement (*see* Doc. 80-11; Doc. 80-12). Then on August 13, 2022, Mr. Ysursa contacted defense counsel, stating "I have been informed by my client that he does not intend to sign the settlement agreement" (Doc. 80-12). Mr. Ysursa also stated that he planned to file a motion to withdraw as counsel (*Id.*), and he did on August 18, 2022 (Doc. 70). In the motion, Mr. Ysursa indicated that he was seeking to withdraw due to an "irreparable breakdown in communication" with his client (Doc. 70). A hearing was held on the motion and the Court learned that the source of the rupture in the attorney-client relationship was Plaintiff's desire to back out of the settlement agreement (Doc. 73). Mr. Ysursa's motion to withdraw was granted and Plaintiff elected to proceed in this matter *pro se* (Doc. 73).

### DISCUSSION

Public policy and the law generally encourage and favor settlements. *Cannon v. Burge*, 752 F.3d 1079, 1104 (7th Cir. 2014) (citing *Carlile v. Snap-on Tools*, 648 N.E.2d 317,

321 (Ill. App. Ct. 1995) ("Public policy favors the settlement of claims, and it is important that claims, once fairly resolved, not be resurrected."); *Owen v. Hankins*, 289 S.W.3d 299, 303 (Mo. Ct. App. 2009) ("It is axiomatic that 'parties to disputes have a right to waive their day in court and to equitably compromise and settle their differences, as it is the policy of the law to encourage freedom of contract and peaceful settlement of disputes.'" (quoting *DeWitt v. Lutes*, 581 S.W.2d 941, 945 (Mo. Ct. App. 1979))). *See also Andes v. Albano*, 853 S.W.2d 936, 940 (Mo. 1993) (en banc). And courts have inherent authority to enforce settlement agreements reached by the parties in a pending case. *Hakim v. Payco-General Am. Credits, Inc.*, 272 F.3d 932, 935 (7th Cir. 2001); *Barry v. Barry*, 172 F.3d 1011, 1013 (8th Cir. 1999) (citing *Gatz v. Southwest Bank*, 836 F.2d 1089, 1095 (8th Cir. 1988)).

The question of whether an agreement was reached is governed by state contract law. *Dillard v. Starcon Int'l Inc.*, 483 F.3d 502, 506 (7th Cir. 2007); *Chaganti & Assocs., P.C. v. Nowotny*, 470 F.3d 1215, 1221 (8th Cir. 2006) (citations omitted). Because Plaintiff has alleged federal employment discrimination claims, any settlement agreement must also be "knowing and voluntary" under federal law. *Dillard*, 483 F.3d at 507 & n.4.

The Court finds that no evidentiary hearing is necessary because the material facts regarding the existence or terms of the agreement are not in dispute. *See Hakim v. Payco-General Am. Credits, Inc.*, 272 F.3d 932, 935 (7th Cir. 2001); *Gatz v. Sw. Bank of Omaha*, 836 F.2d 1089, 1095 (8th Cir. 1988); *Pritchett v. Asbestos Claims Mgmt. Corp.*, 773 N.E.2d 1277, 1284 (Ill. App. Ct. 2002).

## A.  A Settlement Agreement was Reached

In this case, there is a question as to which state's laws the Court should look to in

deciding whether parties entered into a valid and enforceable settlement agreement (*see* Doc. 80, pp. 6–7). The forum state is Illinois, but the settlement was purportedly reached in the mediator's office in Missouri. Defendant says Missouri law applies because that is where the contract was created (Doc. 80, pp. 6–7). Defendant thought, however, that Plaintiff might argue that Illinois law applies (*see id.*), but Plaintiff made no such argument (*see* Docs. 87, 88). The Court need not definitively decide whether Missouri or Illinois law applies because the law in both states is essentially the same.

Under both Illinois and Missouri law, oral agreements to settle are binding so long as there is an offer, acceptance, and a meeting of the minds as to the material terms of the agreement. *Dillard*, 483 F.3d at 507 (quoting *Wilson v. Wilson*, 46 F.3d 660, 666 (7th Cir. 1995)); *Voyles v. Voyles*, 388 S.W.3d 169, 172 (Mo. Ct. App. 2012) (citations omitted). *See also Beverly v. Abbott Lab'ys*, 817 F.3d 328, 333 (7th Cir. 2016) ("A settlement agreement is enforceable if there was a meeting of the minds or mutual assent to all material terms."); *EM Med., LLC v. Stimwave LLC*, 626 S.W.3d 899, 907 (Mo. Ct. App. 2021) ("Offer and acceptance require there to be a mutual agreement, i.e., a meeting of the minds between the contracting parties, which means the parties meet upon and assent to the same thing, in the same sense, and at the same time.") (citation and internal quotation marks omitted).

Whether the parties have reached a meeting of the minds depends on their objective conduct, not their subjective beliefs. *Dillard*, 483 F.3d at 507 (Illinois law); *Don King Equip. Co. v. Double D Tractor Parts, Inc.*, 115 S.W.3d 363, 369 (Mo. Ct. App. 2003). *Accord Newkirk v. Vill. of Steger*, 536 F.3d 771, 774 (7th Cir. 2008) ("When a 'meeting of the minds' question arises, . . . [courts] look first to the written records, not to mental

processes."). An agreement is enforceable if the material terms are sufficiently definite for a reviewing court to ascertain what the parties agreed to. *Dillard*, 482 F.3d at 507 (citing *Quinlan v. Stouffe,* 823 N.E.2d 597, 603 (Ill. App. Ct. 2005); *Bath Junkie Branson, L.L.C. v. Bath Junkie, Inc.*, 528 F.3d 556, 561 (8th Cir. 2008) (citing *L.B. v. State Comm. of Psychologists,* 912 S.W.2d 611, 617 (Mo. Ct. App. 1995)); *Woodson v. Bank of Am., N.A.*, 602 S.W.3d 316, 324 (Mo. Ct. App. 2020) (citing *Arkansas-Missouri Forest Products, LLC v. Lerner*, 486 S.W.3d 438, 448 (Mo. App. E.D. 2016)). The simple fact that a more formal, comprehensive document will follow does not nullify a binding agreement. *Citadel Grp. Ltd. v. Washington Reg'l Med. Ctr.*, 692 F.3d 580, 588 (7th Cir. 2012) ("The fact that parties contemplate that a formal agreement will eventually be executed does not necessarily render prior agreements mere negotiations, where . . . the ultimate contract will be substantially based upon the same terms as the previous document." (quoting *Quake Constr., Inc. v. Am. Airlines, Inc.*, 565 N.E.2d 990, 993 (Ill. 1990))); *Visiting Nurse Ass'n, St. Louis v. VNAHealthcare, Inc.*, 347 F.3d 1052, 1054 (8th Cir. 2003); *2 Mikes, Inc. v. Turning Leaf Properties, LLC*, 423 S.W.3d 860, 867 (Mo. Ct. App. 2014).

Here, the parties participated in court-ordered mediation, at which they were both represented by counsel. After a full day of negotiations, they reached an agreement, and a Settlement Memorandum was prepared. The Memorandum clearly states they agreed to completely settle all of Plaintiff's claims against GWP on nine principal terms, which would be incorporated in a formal and comprehensive written settlement agreement in the days to come (Doc. 80-1). Plaintiff signed the Settlement Memorandum, as did Mark Garnett on behalf of GWP. This signed Settlement Memorandum is evidence that the

parties mutually intended to fully resolve their dispute and had a meeting of the minds as to the essential terms of their agreement. The Memorandum leads the Court to an inescapable conclusion that a valid and binding agreement exists.[4] Moreover, the Settlement Memorandum readily satisfies the requirement that for a contract to be enforceable, the essential terms must be sufficiently definite.

Plaintiff is nevertheless of the belief that the Settlement Memorandum was not a binding agreement (*see* Doc. 87, p. 2). But this is Plaintiff's own subjective belief. Nothing in the Settlement Memorandum suggests, let alone clearly expresses, that the parties did not intend to be bound by their agreement (*see* Doc. 80-1).[5] Rather, the Memorandum expressly indicates that it was a final agreement: "Plaintiff . . . and [GWP] "agree to *finally and completely* settle all of Plaintiff's claims . . . ." (*Id.*) (emphasis added). The parties assented in writing to the unambiguous material terms of the agreement by signing the

---

[4] *See, e.g., Newkirk*, 536 F.3d at 774 (holding "there [was] little room to argue that the district court was wrong in finding that the parties had . . . reached a binding agreement" when the parties filled out a "Settlement Checklist," read the terms of the settlement into the record, and each plaintiff affirmed in open court on the record their agreement with the terms of the settlement); *Lynch, Inc. v. SamataMason Inc.*, 279 F.3d 487, 490–91 (7th Cir. 2002) (when a court reporter takes down the terms of an oral settlement and the parties voice their agreement to those terms in open court, there is "a solid, indeed an unimpeachable, basis for . . . finding . . . that the case had indeed been settled."); *Woodson*, 602 S.W.3d at 323 (parties demonstrated "unequivocal assent to a settlement" of their dispute where they orally negotiated the terms of the settlement, one party memorialized the terms in a settlement memorandum and sent it to the other party, who responded in writing "agreed," and the court was notified at the agreement of both counsel that the matter was settled).

[5] *See, e.g., PFT Roberson, Inc. v. Volvo Trucks N. Am., Inc.*, 420 F.3d 728, 731 (7th Cir. 2005) (explaining that under Illinois law parties negotiating a contract can make their agreement expressly contingent on the preparation and future execution of a formal or final document); *Ocean Atl. Dev. Corp. v. Aurora Christian Sch., Inc.*, 322 F.3d 983, 997 (7th Cir. 2003) ("[W]hen the parties make clear that their mutual obligations are dependent upon the execution of a final contract, their preliminary writing will not be deemed a binding agreement."); *Visiting Nurse Ass'n, St. Louis v. VNAHealthcare, Inc.*, 347 F.3d 1052, 1054 (8th Cir. 2003) (under Missouri law, "an oral agreement is unenforceable if the parties did not intend to be bound by it until it had been reduced to writing. Any such intent, however, must be clear.")

Memorandum. Plaintiff's own subjective believe that the agreement was not binding does not override the objective manifestations of the parties or bar enforcement of the agreement. *See Dillard*, 483 F.3d at 507 ("Whether a meeting of the minds' occurred depends on the parties' objective conduct, not their subjective beliefs."); *Don King Equip.*, 115 S.W.3d at 369 (in determining whether there was a "meeting of the minds," courts in Missouri look to the parties' *objective*, outward manifestations of intent; a person's subjective intent, "secret surmise[,] or undisclosed assumption" is irrelevant.)

The Court thus concludes there was a meeting of the minds on all material terms and the parties reached a valid and binding settlement agreement.

## B. THE SETTLEMENT AGREEMENT IS ENFORCEABLE

The parties valid and binding settlement agreement will be enforced absent a contractual defense, such as fraud, mistake, duress, or undue influence. *Opper v. Brotz*, 661 N.E.2d 1159, 1162 (Ill. App. Ct. 1996); *Kohlbeck v. Wyndham Vacation Resorts, Inc.*, 7 F.4th 729, 738 (8th Cir. 2021) (quoting *Costello Fam. Tr. v. Dean Fam. Lotawana Tr.*, 551 S.W.3d 561, 572 (Mo. Ct. App. 2018)); *Nitro Distrib., Inc. v. Dunn*, 194 S.W.3d 339, 349 (Mo. 2006). *See also* 28 WILLISTON ON CONTRACTS 71:8 (2018) ("[W]here duress induces a contract, just as in the case of fraud, mistake, undue influence, and other invalidating causes, there is an actual and intended expression of assent by the victim to the transaction in question, though the circumstances under which the assent was obtained make it inequitable to permit the enforcement of the resulting bargain.").

Plaintiff makes a litany of arguments as to why the settlement agreement should not be enforced (*see* Docs. 87, 88). They all pertain to contract defenses under state law.

None are clearly articulated or well-developed, and they are often spread out amongst multiple filings, which makes them even more difficult to follow (Docs. 87, 88, 96). Nevertheless, the Court has done its best to make sense of each of Plaintiff's contentions.

First, Plaintiff complains about the circumstances of the mediation (*e.g.*, the choice of mediator, the cost of the mediator, the length of the mediation, the location of the mediation, etc.) and implies that the mediation was unfair (Doc. 87, pp. 2–3). However, none of the circumstances identified by Plaintiff give the Court any pause and certainly do not rise to the level of being manifestly unfair or unconscionable so as to justify allowing Plaintiff to back out of the settlement agreement.

Plaintiff next makes vague allusions that he revoked the "non-binding term sheet" (Doc. 87, pp. 1, 3). However, none of the material terms provided for in the Settlement Memorandum give Plaintiff additional time contemplate the agreement or an opportunity to revoke his acceptance (*see* Doc. 80-1). The Court notes that Plaintiff previously stated during the hearing on his attorney's motion to withdraw that he was under the impression he had ten days to decide whether to back out of the agreement. Even if the Court assumes that to be true, Plaintiff never specifically stated in his briefing when or how he purportedly revoked his acceptance or attempted to revoke it (*see* Docs. 87, 88). Nor did he provide any evidence of formal revocation (*see* Docs. 87, 88). What is more, the email communications provided by both parties suggest that Plaintiff did not seek to back out of the settlement until the first week of August (Doc. 88-4), and GWP was not notified until the second week of August (Doc. 80-13). Both dates went well beyond any purported ten-day period for revocation given that the mediation took place

on June 22, 2022. Consequently, any argument made that the settlement agreement should not be enforced because Plaintiff revoked his acceptance is denied.

Next, Plaintiff states that his attorney, Mr. Ysursa, was "not authorized to negotiate nor settle on his behalf" (Doc. 87, p. 3; *see* Doc. 88-1). He further states that Mr. Ysursa "did not have authority to negotiate further after the Plaintiff revoked the material term sheet" and his "legal agreement with [Mr. Ysursa] explicitly does not give him permission or consent to settle on Plaintiff's behalf" (Doc. 87, p. 3).[6] The Court is not sure what to make of this argument. To begin with, as previously explained, its unclear to the Court when Plaintiff *thinks* he revoked his assent to the Settlement Memorandum. Consequently, the Court cannot tell what portion of Mr. Ysursa's negotiations Plaintiff thinks were unauthorized. The only evidence before the Court shows that Mr. Ysursa's negotiations all occurred before Plaintiff emailed him the first week of August saying he did not intend to sign the formal, written agreement. After Mr. Ysursa received that email, he moved to withdraw. There is no evidence that he made any further attempts to negotiate anything with defense counsel. Additionally, there is no evidence that Mr. Ysursa ever "settled on Plaintiff's behalf." Plaintiff himself agreed to the settlement at the mediation, which is evidenced by the fact that Plaintiff is the one who signed the

---

[6] Doc. 88-1 is a copy of Plaintiff's Legal Services Agreement with Mr. Ysursa, which states in pertinent part, "The Attorney agrees to make no settlement in this matter without the approval of the Client as to the specific settlement. Attorney agrees to notify the Client whenever the Attorney receives an offer of settlement or compromise, and to inform the Client of the amount of that offer, and the recommendation of the attorneys as to its acceptability. Likewise, the Client agrees to make no compromise or settlement in this matter without the approval of the Attorney. The client agrees to notify the Attorney whenever an offer of settlement or compromise is received by the Client, and to inform the Attorneys of the amount in terms of any offer" (Doc. 88-1, p. 1).

Settlement Memorandum and, notably, Mr. Ysursa did not. When it comes to the comprehensive, written settlement agreement, the evidence plainly shows that Mr. Ysursa never fully and formally accepted it. Rather, once Mr. Ysursa and defense counsel negotiated a version of the written settlement agreement that was mutually acceptable to them, Mr. Ysursa indicated that he still needed to get this client's approval (Doc. 80-9). This makes clear that Plaintiff had the final say, not his attorney. Accordingly, Plaintiff's argument that the settlement agreement should not be enforced because Mr. Ysursa did not have authority to negotiate is denied.

Plaintiff also takes issue with a number of other things that Mr. Ysursa purportedly did, which Plaintiff believes collectively amount to "undue influence and financial duress and coercion [sic]" (Doc. 87, pp. 5–6). For example, Plaintiff claims Mr. Ysursa made misstatements to the mediator, withheld deposition transcripts and other discovery from Plaintiff until after the mediation, and lied to Plaintiff about various things (Doc. 87, pp. 5, 6; Doc. 88, pp. 2, 6). However, arguments based on the adequacy of an attorney's representation, regardless of their merit, are irrelevant to the question of whether the settlement agreement is enforceable. *See Westbrook v. Hahn*, 829 Fed. Appx. 128, 131 (7th Cir. 2020) (holding that plaintiff's argument about deficient representation did not render the terms of the contract with defendants too indefinite to enforce) (citing *Stanciel v. Gramley*, 267 F.3d 575, 581 (7th Cir. 2001)); *Baptist v. City of Kankakee*, 481 F.3d 485, 490 (7th Cir. 2007) (holding that the conduct or competence of plaintiff's chosen counsel "is an improper factor in evaluating whether a settlement is knowing and voluntary"); *Harris v. Arkansas State Highway & Transp. Dep't*, 437 F.3d 749, 752 (8th Cir. 2006) (holding that

plaintiff's argument about deficient representation were irrelevant to the determination of whether she gave her attorney express authority to enter into a settlement agreement). *See also Novack v. Drey*, 668 S.W.2d 259, 260 (Mo. Ct. App. 1984) (enforcing settlement because while plaintiff alleged he only signed the settlement under duress from his own attorney, there was no evidence that defendants' participated in or knew of the alleged duress). Allowing Plaintiff to back out of the settlement is not the proper remedy for inadequate representation; this "would be visiting the sins of plaintiff's lawyer upon the defendant." *Baptist*, 481 F.3d at 490. Rather, if Plaintiff wishes to persist with this contention, his remedy is to file suit against his attorney if his attorney's advice and actions amounted to malpractice. *Id.*; *Stanciel*, 267 F.3d at 581.

Plaintiff's next argument is that Defendant made fraudulent misrepresentations of fact (Doc. 87, p. 4). An otherwise enforceable contract may be set aside where there is evidence of fraud in the inducement of the contract. *Lewis v. Sch. Dist. #70*, 648 F.3d 484, 487 (7th Cir. 2011) (citing *Jordan v. Knafel*, 880 N.E.2d 1061, 1069 (Ill. App. Ct. 2007)); *Kohlbeck*, 7 F.4th at 739 (citing *Big A LLC v. Vogel*, 561 S.W.3d 28, 35 (Mo. Ct. App. 2018)). This defense requires Plaintiff to show that the representation was both material and false. *Lewis*, 648 F.3d at 487; *Kohlbeck*, 7 F.4th at 739. Plaintiff must also show that he believed the representation to be true and relied on it to his detriment. *Lewis*, 648 F.3d at 487; *Kohlbeck*, 7 F.4th at 739.

The first purported fraudulent misrepresentation that Plaintiff points to is Mark Garnett's testimony that he sold GWP, which Plaintiff asserts is "verifiably false" (Doc. 87, p. 5). According to Plaintiff, Garnett said he sold GWP in an effort to devalue

Plaintiff's claims and to withhold evidence (specifically "electronic discovery" and/or GWP's "electronic database") (Doc. 87, pp. 3–4; *see also* Doc. 88, pp. 5, 7; Doc. 88-12; Doc. 88-9). Plaintiff also makes the unadorned assertion that he "relied on this information" (Doc. 87, p. 4). Plaintiff did not provide any further explanation (*see* Doc. 87).

The first problem with Plaintiff's argument is that he has not shown convincing proof of the falsity of Garnett's representation. Plaintiff seems to believe that Garnett never actually sold the company but instead simply changed the name. Plaintiff provided the Court with "Amended Articles of Incorporation" showing that Garnett Wood Products Co., Inc. changed its name to "MDG Madera Inc." as of December 31, 2020 (Doc. 88-9). Plaintiff also provided the Court with a list of facts, some of which do not appear to be supported by any evidence (Doc. 88-12, pp. 3–4). Additionally, there seems to be gaps in the information provided by Plaintiff, and the Court is unsure whether it has the full story. More importantly, Plaintiff never explained how the documents he provided prove that Garnett no longer owned the company. As far as the Court can tell, the documents do not provide any indication whatsoever as to who the owners or shareholders of the corporation were. In order to find in Plaintiff's favor, the Court would essentially have to take Plaintiff's word for it that Garnett was still the owner of the company, which the Court simply cannot do.

The second problem with Plaintiff's argument is that he did not explain how/why Garnett's representation that he sold the company was material to the settlement struck between the parties, or that Plaintiff relied on the representation in agreeing to the settlement (*see* Doc. 87, 88). What is more, Mr. Ysursa previously told the Court during

the hearing on his motion to withdraw that any sale of the company by Garnett "[did not] have any [e]ffect on our case . . . other than in the mediation it could have an [e]ffect on who's paying what." For these reasons, Plaintiff has not shown that any fraudulent misrepresentation regarding the sale of GWP justifies allowing him to back out of the settlement agreement.

The second instance of purported fraud that Plaintiff points to pertains to documents that were used as exhibits during various depositions (Doc. 87, p. 4). Plaintiff claims Defendants fabricated these documents and forged his signature on them (Doc. 87, p. 4; *see also* Doc. 88, p. 2; Doc. 88-3; Doc. 88-4). But crucially, Plaintiff never argues that he ever believed these documents were real (*see* Doc. 87, Doc. 88). In fact, he makes clear that he always thought the documents were fake. (His problem seems to be that he thinks his attorney did not raise a sufficient fuss about the documents). Furthermore, in the Court's view, these documents had little to no bearing on the settlement struck between the parties, and Plaintiff provided absolutely no explanation to convince the Court otherwise (*see* Doc. 87, 88). Plaintiff has failed to persuade that the settlement agreement should not be enforced because it was based on fraudulent misrepresentations.

Plaintiff next argues that Defendants have used this litigation "to *continue* to harass, oppress, and intimidate" him (Doc. 87, p. 7) (emphasis added). The Court had trouble making sense of this argument because many of the incidents, events, and actions that Plaintiff cited to occurred while he was still employed and/or before he ever filed this lawsuit (*see id.* at pp. 7–8). Thus, the Court does not see how these things can be

viewed as "continued" harassment that occurred during the course of this lawsuit. Furthermore, the Court fails to see how any of the incidents, events, and actions that Plaintiff cited to had any bearing whatsoever on the settlement negotiations in this case (although they could potentially be used as evidence to prove the merits of Plaintiff's claims), and Plaintiff did not provide any explanation (*see* Docs. 87, 88). The only thing Plaintiff mentioned that happened *after* he filed this suit was that defense counsel subpoenaed his medical, psychotherapy, and family counseling records (*see* Doc. 87, p. 8). The Court does not understand what Plaintiff thinks was objectionable or improper about the subpoena or how it possibly impacted the settlement negotiations in this case. Accordingly, Plaintiff has failed to show that any type of duress or oppression deprived him of exercising his free will in agreeing to the settlement so as to justify allowing him to back out of the agreement. *See Kohlbeck*, 7 F.4th at 738 (under Missouri law, "[d]uress exists when, 'considering all surrounding circumstances, one party to the transaction was prevented from exercising his free will by threats or wrongful conduct of the other.'") (citation omitted); *Baptist*, 481 F.3d at 491, n.2 (under Illinois law, duress "requires more than vexation, the stress of a difficult bargaining position, or financial pressure; duress requires 'imposition, oppression, undue influence, or the taking of undue advantage of the business or financial stress or extreme necessities or weakness[es] of another.'") (citation omitted); *Rissman v. Rissman*, 213 F.3d 381, 386 (7th Cir. 2000) ("Illinois defines duress as 'a condition where one is induced by a wrongful act or threat of another to make a contract under circumstances which deprive him of the exercise of his free will.'") (citation omitted).

Finally, Plaintiff argues the settlement agreement is unconscionable because "[t]he terms as [sic] the 'comprehensive' settlement offer that the Plaintiff never agreed to nor memorialized would impede Plaintiff's ability to earn a living" (Doc. 87, p. 6). Plaintiff does not provide any additional explanation or develop this argument any further (*Id.*). The Court is unable to discern how the settlement agreement possibly thwarts Plaintiff's ability to find a job or make money.

In sum, Plaintiff's arguments fall well short of establishing a reason sufficient to set aside the settlement agreement. Furthermore, entering into the settlement agreement was not Plaintiff's only option; he could have taken his chances continuing to litigate the case. *See Baptist*, 481 F.3d at 491 n.2 ("[A] party asserting duress cannot prevail if he had an alternative to entering into the agreement. The plaintiffs . . . had the option of taking their disparate impact claim to trial, and any claim of duress would necessarily fail.").

### C.  THE SETTLEMENT AGREEMENT WAS KNOWING AND VOLUNTARY

Because the Court finds that the parties' agreement was valid and enforceable under state contract law, it must go on to consider whether the agreement was "knowing and voluntary" under federal law. *Dillard,* 483 F.3d at 507 & n.4. In the Seventh Circuit, a "totality of the circumstances" test is applied, which "requires a detailed look at the circumstances surrounding execution of the [settlement agreement]" that go beyond the ordinary state law requirements for a valid contract. *Id.* at 507; *Baptist*, 481 F.3d at 490; *Pierce v. Atchison, Topeka & Santa Fe Ry. Co. (Pierce I)*, 65 F.3d 562, 570, 571 (7th Cir. 1995). Such circumstances include, for example, the employee's education and business experience, their input in negotiating the terms of the settlement, and the clarity of the

terms, amongst others. *Pierce I*, 65 F.3d at 571. However, if the employee was "represented by chosen counsel throughout negotiations and settlement," the settlement "is presumptively informed and willing." *Baptist*, 481 F.3d at 490; *accord Pierce I*, 65 F.3d at 571 n.1; *Riley v. Am. Family Mut. Ins. Co.*, 881 F.2d 368, 373 (7th Cir. 1989)). That presumption applies here. A showing of fraud or duress is necessary to rebut the presumption and trigger the court's obligation to examine the circumstances surrounding the settlement. *Newkirk*, 536 F.3d at 774.

Plaintiff did not make any arguments expressly directed at overcoming the presumption that the settlement agreement was knowing and voluntary, he never specifically challenged that his consent to the settlement was "knowing and voluntary," and he never discussed any circumstances surrounding the settlement agreement beyond the state law contract defenses that he asserted (*see* Doc. 87). Furthermore, as demonstrated by the Court's analysis above, Plaintiff's arguments of fraud and duress are superficial and not supported by any "specific evidence" sufficient to undermine the validity of the agreement. *Pierce v. Atchison Topeka & Santa Fe Ry. Co. (Pierce II)*, 110 F.3d 431, 438 (7th Cir. 1997). As such, the Court need not evaluate the totality of circumstances. *See Hampton v. Ford Motor Co.*, 561 F.3d 709, 716 (7th Cir. 2009) (explaining that in order for the court to reach the issue of whether a release was knowing and voluntary, "the party challenging the release "must come forward with specific evidence sufficient to raise a question as to the validity of the release." (quoting *Pierce II*, 110 F.3d at 438)); *Newkirk*, 536 F.3d at 774 ("[I]n the absence of a showing of fraud, duress, or other circumstances suggesting that the settlement was not knowing or voluntary, the district

court need not examine the circumstances surrounding the settlement . . . ."); *Pierce I*, 65 F.3d at 572 ("[T]he burden rests on the plaintiff to challenge specifically his voluntary and knowing consent to the release. This is, of course, in addition to any other contentions the plaintiff may or may not make . . . such as duress or fraud. It is only once the plaintiff has raised such a 'totality' challenge—if and only if there is a valid one to be raised—that a court must turn to it." ).

In conclusion, the Court finds that the settlement agreement reached by the parties on June 15, 2022, is a valid agreement under Missouri and/or Illinois law, it was knowing and voluntary under federal law, and it must be enforced. GWP's motion to enforce is therefore granted.

### D.  GWP's Request for Attorneys' Fees

GWP asks the Court to award it attorneys' fees that it has incurred "in [its] efforts to enforce the parties' settlement agreement" (Doc. 80, p. 10). GWP's argument, however, is far too brief and undeveloped to provide a sufficient basis for an award of fees.

GWP seems to argue that the fee award would be based on the Court's "inherent authority to . . . award damages for failure to comply with a settlement agreement." (Doc. 80, p. 10). GWP does not, however, provide any further explanation. In particular, GWP does not explain the legal standard for imposing sanctions based on the court's inherent authority, nor does GWP explain why it believes Plaintiff's conduct satisfies that standard or provide any citations to cases in which fees were awarded under similar circumstances (*see* Doc. 80, pp. 10–11).

GWP also points to paragraph 8 of the Settlement Memorandum as a possible basis

for a fee award (Doc. 80, p. 10). That paragraph provides "In the event of an action for breach of the settlement, the prevailing party in such action shall be entitled to recover its reasonable attorney's fees from the non-prevailing party." (Doc. 80-1). It is not clear to the Court, however, that paragraph 8 requires fee shifting in a situation like this where the parties are disputing the existence of a valid and enforceable agreement, as opposed to the breach of an agreement whose existence is undisputed. And GWP did not provide any explanation as to why it believes the present dispute is covered by the fee-shifting provision of the parties' agreement (*see* Doc. 80).

For these reasons, GWP's request for an award of fees is denied. This is not to say that GWP's ultimate conclusion that it is entitled to fees is wrong. It is simply to say that on the present state of the briefing, GWP has not supported their conclusion with a sufficient explanation.

**E.  Plaintiff's Motion Re: Mediator Fee, PACER Exemption, and Transcript Fee**

Plaintiff asks the Court to waive his share of the mediator's fee, claiming Mr. Neuner's fee of $4851.00 "is unreasonably burdensome" and Plaintiff is financially unable to pay his half of that charge (Doc. 95, p. 1). Plaintiff cites to Section 4.5(A) of the District's Mandatory Mediation Plan, which provides:

> A party who has not sought in forma pauperis status but is financially unable to pay all or part of the pro rata share of the mediator's fee, may move for a waiver of the fee requirement. The Court shall then direct that the portion of that party's share of the mediator's fee be paid out of the District Court Fund pursuant to §2.12 of that Plan.

Plaintiff's request is denied at this time because he has not provided the Court with information regarding his current financial status sufficient for the Court to

determine that he is financially unable to pay his share of Mr. Neuner's fee. Plaintiff indicated that he "has liquidated his retirement . . . as well as children's 529 college savings accounts." (Doc. 95, p. 2). However, Plaintiff did not swear to the truth of his statement or provide any evidence to support his statement.[7] The other evidence that Plaintiff submitted is either outdated (it predates his termination from GWP in December 2018) or irrelevant to the issue of his current ability to pay the mediator's fees.

Plaintiff's next request pertains to the exemption from PACER fees that the Court granted him on February 8, 2023 (*see* Doc. 92). Plaintiff indicates that his PACER account was disabled a month after the exemption was granted, and he was instructed that he had to pay all of the charges incurred on his account prior to the exemption in order to regain access to his account (Doc. 95, p. 3). He asks the Court "to backdate the PACER exemption to include fourth quarter 2022, at which time Plaintiff may seek a refund from PACER." (*Id.*). Plaintiff's request is denied. The Court granted Plaintiff an exemption from PACER fees and does not have the inclination (nor is the Court convinced it has the authority) to modify the exemption in the manner Plaintiff asks and for the purpose he identified.

Plaintiff's last request is for a waiver of transcript fees for the transcript of the hearing on Mr. Ysursa's motion to withdraw on August 30, 2022 (Doc. 95, p. 3). Plaintiff indicates that he wants to send the transcript to the Illinois Attorney Registration and Disciplinary Commission ("ARDC") and to the Office of the Chief Disciplinary Counsel

---

[7] He cited to "Exhibit #2" and "Exhibit #5," (Doc. 95, p. 2), however, neither Exhibit appears to contain any information or data about a retirement account or a college savings account (*see* Doc. 96-2, Doc. 96-5).

of the Supreme Court of Missouri "to exhibit in counselors' formal disciplinary complaints" (*Id*.). The Court presumes this means Plaintiff has filed a complaint against his former attorney and he wants to submit the transcript for consideration and context.

The transcript that Plaintiff is seeking was not prepared by the court reporter and is not on the docket. Plaintiff's request would require the Court to order the court reporter to prepare the transcript at the expense of the United States and then provide a copy to him free of charge. He has not identified a rule or statute that permits (let alone requires) the Court to provide him with a transcript under the circumstances he has identified. *See* U.S.C. § 753(f) (authorizing preparation of transcripts at government expense in civil cases "to persons permitted to appeal in forma pauperis . . . if the trial judge . . . certifies that the appeal is not frivolous"); *Maus v. Baker*, 729 F.3d 708, 709–10 (7th Cir. 2013). Accordingly, this request is denied. Plaintiff can contact Court Reporter Stephanie Rennegarbe for an estimate of what the transcript would cost along with instructions as to how payment can be made.

## Conclusion

Plaintiff's "Motion for Backdating of Pacer Exemption and Waiver of Pro Rata Share Fee of Mediator Fee" (Doc. 95) is **DENIED.**

Defendant GWP's Motion to Enforce Settlement and Request for Attorney's Fees (Doc. 80) is **GRANTED in part and DENIED in part.** The request to enforce the settlement is **GRANTED**. The settlement agreement reached on June 15, 2022, is **ENFORCED.** The request for fees is **DENIED**.

Defense counsel is **DIRECTED** to send new copies of the final revised version of the comprehensive written settlement agreement that was drafted with the assistance and input of Plaintiff and his former counsel to Plaintiff no later than **May 17, 2023.** If Plaintiff has any additional proposed revisions to the terms of the agreement — **which must be consistent with the parties' agreement as stated in the Settlement Memorandum signed on June 15, 2022 and this Court's Order** — he must provide those to defense counsel no later than **May 22, 2023**. If, however, Plaintiff has no additional proposed revisions, then he must complete and return the settlement paperwork to defense counsel no later than **May 22, 2023**.

In the event the Plaintiff proposes revisions, and they are acceptable to defense counsel, then the settlement agreement must be signed by both parties on or **May 26, 2023**. If, however, the proposed revisions are not acceptable to defense counsel, then the parties are **DIRECTED** to submit Plaintiff's revisions to the Court's proposed documents inbox (MABpd@ilsd.uscourts.gov) on or before **May 26, 2023,** and the Court will then set this case for a status conference to take up Plaintiff's proposed revisions to the settlement documents.

The Clerk of Court is **DIRECTED**, 30 days after entry of this Order, to **ENTER JUDGMENT OF DISMISSAL** with prejudice. Each party shall bear its own costs, unless otherwise provided in the settlement documents. If the parties fail to finalize the settlement within the 30-day period, they may -- before that period expires -- move to postpone entry of judgment to a later date.

**IT IS SO ORDERED.**

**DATED: May 12, 2023**

                                 **s/ Mark A. Beatty**
                                 **MARK A. BEATTY**
                                 **United States Magistrate Judge**